## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **HAROLD E. HILL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 04-CV-0028-CVE-PJC** |
| | ) | |
| **THOMAS E. KEMP, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION AND ORDER

Now before the Court is Plaintiff [Oklahoma Religious Coalition for Reproductive Choice Education Fund, Inc.'s] Motion for Summary Judgment and Brief in Support (Dkt. # 153). Plaintiff Oklahoma Religious Coalition for Reproductive Choice Education Fund, Inc. (ORC) seeks summary judgment on its claims under 42 U.S.C. § 1983 alleging that OKLA. STAT. tit. 47, § 1104.6 violates its rights under the First Amendment (Count Five) and the Equal Protection Clause of the Fourteenth Amendment (Count Six), because the statute interferes with its right to use its private funds for abortion-related activities. Defendant Howard H. Hendrick responds that the challenged statute is constitutional because ORC can apply for state funding through a structurally separate affiliate while maintaining its right to engage in abortion-related activities with its private funds.

### I.

The State of Oklahoma (the State) permits motorists to purchase a special license plate bearing the expression "Choose Life" for an additional $35 above the cost of a standard license plate

issued to Oklahoma motorists.[1]  Of this additional $35 fee, $8 is directed to the Oklahoma Tax Commission, and $7 goes to school districts and other state funds.  The State is required to deposit the remaining $20 in the Choose Life Assistance Program Revolving Fund (the Fund) created by OKLA. STAT. tit. 47, § 1104.6.  At the beginning of the next fiscal year, the Oklahoma Department of Human Services (DHS) is required to distribute money deposited in the Fund on a pro rata basis to all eligible applicants who apply to receive a disbursement from the Fund.  Money in the fund is distributed to nonprofit organizations "that provide service to the community that include counseling and meeting the physical needs of pregnant women who are committed to placing their children for adoption." OKLA. STAT. tit. 47, § 1104.6B.  Hendrick is the Director of DHS and has final authority to grant or deny an application to receive a disbursement from the Fund.

Section 1104.6 requires an applicant for funding to submit an affidavit to DHS establishing that the applicant is eligible to receive money from the Fund.  The statute lists nine requirements that must be satisfied before a disbursement may be made:

1.  The organization is a nonprofit organization;

2.  The organization does not discriminate for any reason, including, but not limited to, race, marital status, gender, religion, national origin, handicap or age;

3.  The organization counsels pregnant women who are committed to placing their children for adoption;

4.  The organization is not involved or associated with any abortion activities, including counseling for or referrals to abortion clinics, providing medical abortion-related procedures, or pro-abortion advertising;

---

[1]  The parties have filed a Joint Stipulation Regarding Certain Undisputed Facts (Dkt. # 150), and both parties rely solely on these facts in their briefing.  Consequently, there are no genuine issues of material fact and the Court is faced with a purely legal issue concerning the constitutionality of § 1104.6.

5.  The organization does not charge women for any services received;

6.  The organization understands that sixty percent (60%) of the funds received by an organization can only be used to provide for the material needs of pregnant women who are committed to placing their children for adoption, including clothing, housing, medical care, food, utilities, and transportation.  Such funds may also be expended on infants awaiting placement with adoptive parents.  Forty percent (40%) of the funds may be used for adoption, counseling, training, or advertising, but may not be used for administrative expenses, legal expenses, or capital expenditures.

7.  The organization understands that no funds may be used for administrative expenses, legal expenses, or capital expenditures;

8.  The organization understands that any unused funds at the end of the fiscal year that exceed ten percent (10%) of the funds received by the organization during the fiscal year must be returned to the [Fund] to be aggregated and distributed with the next fiscal year distribution; and

9.  The organization understands that each organization that receives such funds must submit to an annual audit of such funds verifying that the funds received were used in the manner prescribed by statute.

Id. at § 1104.6C.  The statute prohibits the distribution of funds to "any organization that is involved or associated with abortion activities, including counseling for or referral to abortion clinics, providing medical abortion-related procedures, or pro-abortion advertising . . . ."  Id. at § 1104.6D.  DHS has not adopted an application form and a nonprofit organization's affidavit is treated as an application to receive funding.

ORC is a nonprofit corporation based in Tulsa, Oklahoma.  It was originally established in 1978 as the Oklahoma affiliate of the Religious Coalition for Abortion Rights, but that organization has since changed its name to the Religious Coalition for Reproductive Choice.  ORC states that it is a "statewide coalition of Christian, Jewish, and other religious organizations supporting choice in family planning, regardless of income, culture, race, class, gender or ethnic origin," and it interprets the phrase "choice in family planning to mean a woman's freedom to choose, according

to her own faith, traditions or religious and moral beliefs, among all available reproductive options both before and after conception, including abortion." Dkt. # 150, at 4. ORC provides counseling services to pregnant women concerning parenting, adoption, and abortion, and accepts counseling referrals from similar organizations. ORC also maintains a Roe Fund to assist impoverished women with incidental costs related to obtaining an abortion. ORC does not charge any woman for services. In addition to these services, ORC engages in activities that express support for a wide range of family planning options, including peaceful demonstrations outside health facilities providing abortions to support choice in family planning, periodic worship gatherings for those who wish to express support for choice in family planning, and promoting the Clergy for Choice Network of the Religious Coalition for Reproductive Choice.

ORC states that it applied for money from the Fund to create a program to support women who "decided that adoption is the appropriate option given their circumstances" and to provide related counseling and training services. Id. at 6. It submitted applications for funding following the end of the fiscal years 2005 through 2008, and each of its applications was denied. In each of its applications, ORC stated that it understood that it could not use "any funds from the [Fund] for any activities involved with or associated with abortion, including counseling for or referrals to abortion clinics, providing medical abortion-related procedures, or pro-abortion advertising." Dkt. # 150, Ex. 1, at 2. DHS denied ORC's applications because ORC refused to attest or did not provide documentation to show that ORC was not involved or associated with abortion activities. Id., Ex. 5, at 2. ORC's applications would have been approved if it could have attested that it did not engage in abortion-related activities as described in § 1104.6.

On January 14, 2004, ORC and others filed this lawsuit alleging six claims under § 1983. Counts One through Four were filed by Oklahoma citizens who alleged that § 1104.6 violated their constitutional rights of freedom of speech, due process, and equal protection, and Courts Five and Six alleged that § 1104.6 infringed upon ORC's rights of freedom of speech and equal protection respectively. The Court dismissed the case for lack of subject matter jurisdiction because plaintiffs' claims were barred by the Tax Injunction Act, 28 U.S.C. § 1341, and the Eleventh Amendment. The Tenth Circuit Court of Appeals affirmed in part and reversed in part. Hill v. Kemp, 478 F.3d 1236 (10th Cir. 2007). The Tenth Circuit affirmed dismissal of the individual citizens' claims under the Tax Injunction Act; however, the Tenth Circuit found that the relief sought against State officials was prospective only and not barred by the Eleventh Amendment, and remanded for further proceedings as to Counts Five and Six. Following remand, the Court held a status conference on May 2, 2007. The parties agreed that the undersigned should remain as the presiding judge over this case, but some of the defendants stated that they would file motions to dismiss as to Counts Five and Six. See Dkt. # 107. The Court entered an agreed order requiring Hendrick to set aside and maintain the amount that ORC would have received if its application for funding had been approved for 2005 and 2006, and also to set aside a pro rata share for amounts ORC might apply for while this case is pending. Dkt. # 109. The Court also set a briefing schedule for additional motions to dismiss concerning defendants' arguments that ORC's claims were barred by sovereign immunity or that certain defendants were not proper parties.[2] The Court dismissed all remaining defendants except

---

[2]     Defendant Brad Henry, sued in his official capacity as Governor of Oklahoma, filed a motion to stay the case or, in the alternative, asked the Court to abstain from exercising jurisdiction over this case. Dkt. # 119. The Court denied his motion and proceeded with the case. Dkt. # 132.

Hendrick, and denied his request to stay the case.  Dkt. # 144.  The Court also entered an amended scheduling order setting deadlines for Hendrick to answer the amended complaint and for both parties to file motions for summary judgment.  ORC has filed a motion for summary judgment as to both remaining claims against Hendrick, and the motion is ripe for adjudication.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court

6

is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

ORC asks the Court to declare § 1104.6C.4 and D unconstitutional, and to enjoin the State from enforcing those subsections of § 1104.6.  ORC raises three arguments in its motion for summary judgment: (1) § 1104.6 violates the unconstitutional conditions doctrine; (2) § 1104.6 constitutes viewpoint discrimination in violation of the First Amendment; and (3) ORC has been denied equal protection of the law in violation of the Fourteenth Amendment.  Defendant responds that the State may choose not to fund abortion-related activities without violating ORC's freedom of speech.  Defendant also argues that § 1104.6 allows ORC to establish a structurally separate entity that does not engage in abortion-related activities, and this alternative is sufficient to avoid any interference with ORC's First Amendment rights.

## A.

ORC argues that the State may not condition ORC's eligibility to receive funding based on ORC's refusal to attest that it does engage in abortion-related activities, because this imposes an unconstitutional condition on ORC's use of its separate, private funds.  Dkt. # 153, at 16-20. Hendrick responds that the State may choose not to fund abortion-related activities, and the eligibility requirements of § 1104.6 ensure that ORC's private funds, that may be used to fund abortion-related activities, are not co-mingled with money from the Fund that must be spent on adoption-related activities only.  Dkt. # 156, at 7.  He argues that ORC is free to establish a

structurally separate affiliate to apply for funding, while still maintaining its abortion-related activities with its private funds.

The government may not deny a benefit to a person based on a condition that infringes on that person's constitutionally protected rights. KT & G Corp. v. Attorney General of Oklahoma, 535 F.3d 1114, 1136 (10th Cir. 2008). The Supreme Court has stated:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests-especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly."

Perry v. Sindermann, 408 U.S. 593 (1972). When the government creates a spending program, it is also entitled to define the limits of the program and impose requirements for the distribution of funds. United States v. American Library Ass'n, Inc., 539 U.S. 194, 211 (2003).

The Supreme Court has established that a woman has a fundamental right to obtain an abortion in some circumstances, but a state has no obligation to subsidize a woman's exercise of this right. See Harris v. McRae, 448 U.S. 297 (1980) ("regardless of whether the freedom of a woman to choose to terminate her pregnancy for health reasons lies at the core or the periphery of the due process liberty recognized in Wade, it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices); Maher v. Roe, 432 U.S. 464 (1977) (state not required to fund nontherapeutic abortions for Medicaid recipients, because state could choose to fund childbirth rather than abortion). Plaintiff is not asking the State to directly fund abortion-related services. Instead,

plaintiff claims that it should be permitted to apply for funding to provide adoption-related services, even though it also provides abortion-related services with its separate private funds.  Plaintiff argues that any limitation on the use of its private funds is an unconstitutional condition that may not be attached to receipt of state funding, because this requires plaintiff to give up its right to free speech in order  to qualify for funding.

In Regan v. Taxation with Representation of Washington, 461 U.S. 540 (1983), and Federal Communications Commission v. League of Women Voters of California, 468 U.S. 364 (1984), the Supreme Court was asked to apply the unconstitutional conditions doctrine in the context of alleged governmental interference with an organization's First Amendment right to free speech.  Regan concerned a provision of the Internal Revenue Code (IRC) that prohibited tax exempt organizations from engaging in lobbying activity.  Regan, 461 U.S. at 542.  Specifically, 26 U.S.C. § 501(c)(3) denied tax exempt status to any entity that engaged in "carrying on propaganda, or otherwise attempting to influence legislation."  Taxation with Representation of Washington (TWR) sued the Secretary of the Treasury seeking a declaratory judgment that it qualified for tax exempt status, even though it engaged in lobbying activity, because § 501(c)(3) violated TWR's rights under the First and Fourteenth Amendments.  Id. at 542.  The Supreme Court stated that a tax exemption is akin to "a cash grant to the organization of the amount of the tax it would have payed on its income" and, as a spending program, Congress could choose to subsidize some activities and not others.  While TWR was correct that Congress could not condition receipt of funding on the waiver of a constitutional right, the tax exemption did not deprive TWR of a constitutional right or penalize TWR for exercising its constitutional rights.  Id. at 545.  The Court found that TWR was asking Congress to subsidize its lobbying activities through a tax exemption, and this was not required by

9

the First Amendment or the Equal Protection Clause of the Fourteenth Amendment.  Importantly, the Court also found that TWR could create a separate entity to receive donations under § 501(c)(4) of the IRC and engage in lobbying activity while still maintaining its tax exempt status, and this provided a sufficient alternative to protect TWR's right to free speech.  Id. at 545.

In League of Women Voters, the owner of a noncommercial, educational broadcasting station that received funds under the Public Broadcasting Act of 1967, 47 U.S.C. § 390 et seq., challenged a provision of that statute prohibiting stations receiving funding from "editorializing." League of Women Voters, 468 U.S. at 367.  The district court found that the provision violated the owner's First Amendment rights, and the Federal Communication Commission (FCC) appealed directly to the Supreme Court.  Id. at 372-73.  The Supreme Court affirmed the district court's decision.  The Court recognized that Congress has authority under the Commerce Clause to regulate public broadcasting stations and ensure that recipients of public funds provide programming that is truly in the public interest.  Id. at 376.  To carry out this goal, Congress has some power to regulate the content of public broadcasting to the extent it is necessary to provide a "balanced presentation of information on issues of public importance." Id. at 377.  However, the First Amendment provides an important limitation on Congressional power to regulate public broadcasting, because the public has an interest "in receiving a balanced presentation of views on diverse matters of public concern." Id. at 380.  In League of Women Voters, the station received only one percent of its operating funds from governmental grants, and the statute prevented a station from using its separate funds to editorialize.  Id. at 400.  Unlike Regan, a station could segregate its private funds from governmental funds, and engage in editorializing without infringing on Congress' legitimate reasons for preventing the use of public funds for editorializing.  Congress could also amend the statute to require a public

broadcasting station to establish a separate entity to editorialize with nonfederal funds. However, the Act did not permit such an alternative and the disputed provision of the Act was unconstitutional. Id. at 400-01.

Both parties rely on the Supreme Court's decision in Rust v. Sullivan, 500 U.S. 173 (1991), to support their arguments. Defendant argues that the State may choose not to fund abortion-related activities, and Rust stands for the proposition that a State is not required to fund, directly or indirectly, any person's right to provide or obtain abortion-related services. Dkt. # 156, at 7. Plaintiff responds that it not asking the State to fund abortion-related services, and Rust does not apply. Dkt. # 153, at 19. In Rust, recipients of funding under Title X of the Public Health Service Act, 42 U.S.C. § 300, were prohibited from using funding for "programs where abortion is a method of family planning." Rust, 500 U.S. at 178. The Department of Health and Human Services promulgated regulations clarifying that funds could not be used for abortion counseling or services, nor could a recipient encourage or advocate for abortion as a method of family planning. Id. at 179-180. A recipient was required to maintain total physical and financial separation from any organization that provided abortion-related services. Id. at 180-81. A group of recipients and physicians challenged the regulations on the grounds that their First and Fifth Amendment rights were being violated, and they sought an injunction barring implementation of the regulations. The district rejected their arguments, and the Second Circuit affirmed the district court's decision.

The Supreme Court found that the regulations were not unconstitutional because the regulations were a permissible exercise of the government's right to decline to fund abortion-related activities. The government's refusal to fund abortion services was not a penalty, because the

government does not have an underlying obligation to provide funding for the exercise of a woman's constitutional right to obtain an abortion.  Id. at 193.  The Court stated:

> The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.  In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.

Id.  The Court suggested that, if the government were required to fund alternative programs whenever Congress made a choice to fund one activity over another, many governmental programs would be unconstitutional.  Id. at 194.  The Court found that the challenged regulations were constitutional and did not deprive recipients of funding or physicians of their speech rights.

Rust is not directly on point.  Plaintiff is not asking the State to fund its abortion-related services, but is seeking publicly-available funds for its adoption-related services.  ORC has been denied public funding because it provides abortion-related services with its private funds, in addition to any other services it may offer.  ORC is not disputing the State's right to make a choice between funding family planning services to the exclusion of abortion-related services, and plaintiff's arguments do not implicate Rust.  Much like League of Women Voters, § 1104.6 establishes a spending program that provides a limited amount of government funds for a specified purpose, adoption-related services for indigent women, but denies access to funding if an organization also engages in a disfavored activity with its own funds.  The State is free to fund adoption services to exclusion of any abortion-related services, but it may not deny ORC funding conditioned upon ORC's waiver of its right to engage in protected speech activity with its private funds.

Although not cited by either party, the Eighth Circuit has addressed the constitutionality of a similar Missouri statute under the unconstitutional conditions doctrine, and the Court finds the

12

Eighth Circuit's decision relevant and helpful to resolution of the issues raised by ORC.  In Planned Parenthood of Mid-Missouri and Eastern Kansas, Inc. v. Dempsey, 167 F.3d 458 (8th Cir. 1998), Missouri funded a family planning program for low-income individuals, but prevented any organization receiving funding from spending state funds on abortion services.  Planned Parenthood provided abortion services with its private funds, but was initially eligible to receive funds because it abided by the requirement not to spend state funds on abortion services.  Id. at 460.  Missouri amended its statute to prohibit the receipt of state funds by any organization that also provided abortion services with its private funds, because it believed that abortion providers were receiving an indirect benefit from the program.  Planned Parenthood filed a suit in federal court challenging the amended statute, and the district court found that the amended statute was unconstitutional.  Instead of appealing the district court's decision, the State amended the statute again in an attempt to avoid the constitutional deficiencies found by the district court.  The amended statute provided:

> For the purpose of funding family planning services, pregnancy testing and follow-up services, provided that none of these funds may be expended for the purpose of performing, assisting or encouraging for abortion, and further provided that none of these funds may be expended to directly or indirectly subsidize abortion services or administrative expenses, as verified by independent audit.  None of these funds may be paid or granted to organizations or affiliates of organizations which provide or promote abortions. . . .

Id. at 463.  Under the amended statute, Planned Parenthood was no longer eligible to receive funding under the program.

Planned Parenthood filed suit challenging the constitutionality of the amended statute on the grounds that it violated the unconstitutional conditions doctrine, the Equal Protection Clause, and constituted a bill of attainder.  Id. at 461.  The district court enjoined the State of Missouri from enforcing the statute, and Missouri appealed to the Eighth Circuit.  The Eighth Circuit reversed the

district court's decision, because it was possible to read the amended statute in a manner to avoid a constitutional problem. Id. at 463. The Eighth Circuit considered the unconstitutional conditions doctrine, and determined that the challenged statute would be unconstitutional if it were interpreted to prevent an applicant from receiving funds based on its affiliation with an abortion service provider. Id. (the statute "would cross the line established in *Rust*, *League of Women Voters*, and *Regan*, and hence would be an unconstitutional condition, if we interpreted it to prohibit grantees from having any affiliation with abortion service providers"). However, the statute was constitutional as long as it was interpreted to allow an applicant to exercise its right to free speech with its own funds and apply for state funding through an independent affiliate. Id. This interpretation "respects the State's valid policy decision to remove its imprimatur from abortion services and to encourage childbirth over abortion," and allowed Planned Parenthood to exercise "its constitutional right to establish an independent affiliate to provide abortion services outside the government program." Id. at 463-64.

This Court finds that § 1104.6 is similar to the Missouri statute challenged in Planned Parenthood. Under Rust, the State is not required to directly fund abortion or abortion-related services. However, ORC is not asking the State to fund its operations to the extent that it provides abortion-related services. Instead, ORC claims that § 1104.6 prevents it from exercising its right to free speech with its own funds and imposes an unconstitutional condition on the use of separate, private funds that are not provided by the State. The State could not directly forbid ORC from providing abortion-related services or from advocating for abortion. However, § 1104.6 effectively asks ORC to choose between foregoing publicly-available funding for adoption-related services that are encouraged by the State or accepting money from the Fund at the cost of abandoning its

constitutional right to provide abortion-related services.  Unless defendant is correct that § 1104.6 allows ORC to apply for funds through a structurally separate affiliate, the statute is an impermissible use of the State's spending power and is unconstitutional.  Before the Tenth Circuit, ORC acknowledged "that it would be entirely permissible for Oklahoma, consistent with the regime approved by the Supreme Court in *Rust*, to require private organizations (like ORC) that support both adoption and abortion to create a structurally separate affiliate that does not engage in abortion activities to receive and account for governmental funds in order to ensure that no way intermingled with privately raised funds used for the group's separate abortion-related activities."  Hill v. Kemp, 478 F.3d 1236, 1261 (10th Cir. 2007).  However, the Tenth Circuit did not consider whether § 1104.6 permitted this alternative.

The Court is cognizant that it should construe a statute to avoid a constitutional problem if such a construction is feasible.  Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568 (1988) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"); Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 397 (1988) ("It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld.  The key to application of this principle is that the statute must be 'readily susceptible' to the limitation; we will not rewrite a state law to conform it to constitutional requirements."); United States v. Hinckley, 550 F.3d 926, 948 (10th Cir. 2008) ("The Supreme Court tells us that we ought to construe statutes to avoid problems of potential constitutional dimension when a plausible alternative exists.").  Although §

1104.6 does not expressly address the possibility that a structurally separate entity might apply for funds, this issue has been raised by defendant and is suggested by applicable precedent.  This reading of the statute, if plausible, would avoid a constitutional problem and the Court must consider this alternative.

ORC argues that § 1104.6 does not allow it to apply for funds through a structurally separate affiliate because the statute prohibits the distribution of funds to an organization that "is involved or associated with abortion activities."   OKLA. STAT. tit. 47, § 1104.6D.   While § 1104.6 does not expressly permit ORC to apply for funding through a separate affiliate, it does not exclude this possibility.  The language cited by ORC places a limitation on the organization applying for funds by denying money to an organization that is "involved or associated with abortion activities." However, it is not plausible to read this language as forbidding distribution of funds to organization merely because it is associated with another organization that does provide abortion services.  The statutory language applies only to the organization actually applying for funds.  It is understandable why ORC does not want to create a separate organization to apply for funding, but there is no language in the statute foreclosing such an interpretation of § 1104.6.  Thus, ORC has an alternative method to apply for funding and maintain its abortion-related activities, and this interpretation § 1104.6 is not implausible, nor does it require the Court to rewrite the statute.

ORC argues that § 1104.6 is unconstitutional even if the statute allows ORC to apply for funding through an affiliate, because this is not a sufficient alternative to protect its First Amendment right to free speech.  However, Regan, League of Women Voters, and Rust clearly show that a statute may be interpreted to avoid a problem under the unconstitutional conditions doctrine by allowing an organization to apply for funding through a structurally separate affiliate.

ORC cites <u>Brooklyn Legal Services Corp. v. Legal Services Corp.</u>, 462 F.3d 219, 232 (2d Cir. 2006), to support its argument that the option to create a legally separate affiliate is not always an adequate alternative.  Dkt. # 153, at 19 n.3.  In that case, the Second Circuit stated that an adequate alternative does not exist if the government creates obstacles to the formation of a separate affiliate, but <u>Brooklyn Legal Services Corp.</u> does not question the validity of <u>Regan</u>, <u>League of Women Voters</u>, or <u>Rust</u>, or suggest that the option to create an affiliate is ordinarily an inadequate alternative.  The Court has found that ORC may apply for funding through a structurally separate affiliate that does not engage in abortion-related activities, and ORC has identified no other roadblocks under Oklahoma law to forming a separate entity.  Therefore, § 1104.6 does not violate the unconstitutional conditions doctrine, and will not be invalidated on this ground.

**B.**

ORC argues that the State is engaging in viewpoint discrimination in violation of the First Amendment, because the State is penalizing non-profit organizations that do not share its viewpoint about abortion. ORC does not dispute the State's right to favor adoption over abortion but claims that § 1104.6 denies it the right to use private funds to express a viewpoint disfavored by the State. Defendant does not directly respond to this argument, except to note that the State may express an opinion in favor of adoption or other alternatives to abortion.

It is clearly established that the government may not regulate private speech based on the content of the speech or viewpoint of the speaker.  <u>Rosenberger v. Rector and Visitors of University of Virginia</u>, 515 U.S. 819 (1995).  The government may not use its spending power to suppress "dangerous ideas" or coerce private actors into giving up their freedom of speech.  <u>National Endowment of the Arts v. Finley</u>, 524 U.S. 569, 587 (1998).  However, in government funding

cases, the government does not necessarily engage in viewpoint discrimination simply because it has "chosen to fund one activity to the exclusion of another." Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 540 (2001) (quoting Rust, 500 U.S. at 193).  The government is permitted to attach conditions to the grant of government funds as long as the government does not use the funding program to suppress the recipients' right to express a different or disfavored viewpoint with its private funds.  See American Library Ass'n, 539 U.S. at 213-14 (Congress validly exercised its Spending Clause power by requiring public libraries to use Internet filtration software because the spending program did not induce public libraries or their patrons to abandon their First Amendment rights); Legal Servs. Corp., 531 U.S. at 541 ("We have said that viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker . . . or instances, like *Rust*, in which the government "used private speakers to transmit specific information pertaining to its own program.").  Recipients of government funding must be permitted to express disfavored viewpoints through an alternate channel or forum for speech, such as through the use of non-government funds, to avoid the possibility of viewpoint discrimination under the First Amendment.

Plaintiff relies on Alliance for Open Society Int'l, Inc. v. United States Agency for Int'l Development, 430 F. Supp. 2d 222 (S.D.N.Y. 2006), to support its argument that any restriction preventing it from using its private funds for abortion-related activities constitutes viewpoint discrimination.  The Alliance for Open Society International (AOSI) challenged a federal statute requiring it to adopt an express policy "opposing prostitution and sex trafficking" in order to receive federal funding under the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003, 22 U.S.C. § 7601 et seq.  Id. at 234.  The United States Agency for International Development (USAID) initially refrained from enforcing this section of the statute, because the

Department of Justice advised USAID that application of this requirement to United States-based organizations was unconstitutional.  However, USAID subsequently reversed its position and began requiring United States-based organizations to adopt an express policy opposing the legalization of prostitution before the organizations could be eligible for funding.  AOSI and other organizations sought an injunction against enforcement of this requirement because it restricted their speech activity as to the use of their private funds.  The district court entered a preliminary injunction preventing USAID from denying funds solely for an organization's refusal to adopt a policy opposing the legalization of prostitution.  Specifically, the district court found that the organizations were likely to succeed on the merits as to their allegations of viewpoint discrimination.  Id. at 271-72.  The government relied on Rust and Legal Services Corp. to argue that it could use a funding program to convey a message opposing the legalization of prostitution.  However, the government had gone further in Alliance for Open Society because it actually required AOSI to adopt a policy that it would not use its private funds to advocate for the legalization of prostitution.  Id. at 275.  Because the statute compelled a private organization to enact a policy that would affect its use of private, non-governmental funds, there was no adequate alternative method to allow the organization to express a contradictory viewpoint, and the requirement to enact a policy opposing the legalization of prostitution constituted impermissible viewpoint discrimination.

Alliance for Open Society can be distinguished on two important grounds from this case.  First, the challenged statute in Alliance for Open Society went beyond a government expression of a particular viewpoint and denial of funds to organization that did not share the same viewpoint but, instead, the government was compelling speech by requiring a recipient to adopt a policy that would impact its use of governmental and private funds.  In this case, the State has not asked recipients of

State funding to adopt an express policy against abortion; it has merely denied funds for adoption-related services to organizations that also provide abortion-related services.  Second, the nature of the policy requirement in <u>Alliance for Open Society</u> did not allow for an organization to apply for funds through a separate entity, because the separate entity would also have to adopt a policy expressing the government's viewpoint opposing the legalization of prostitution.  ORC is free to create a separate entity to receive funding for adoption services without giving up its First Amendment rights or making any compelled speech through the separate entity.

For the same reasons that § 1104.6 does not qualify as an unconstitutional condition, the Court also finds that the State is not engaging in prohibited viewpoint discrimination in violation of the First Amendment.  <u>Rust</u> clearly states that the government does not engage in unconstitutional viewpoint discrimination "when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals . . . ."  <u>Rust</u>, 500 U.S. at 194.  In this case, the State has denied funds for an adoption-only program to organizations that also provide abortion services out a legitimate concern that state funds could be intermingled with the organization's private funds.  The statute does not expressly prohibit ORC from creating a legally separate entity, and defendant has argued that the statute permits ORC to apply for funds through a separate entity.  This is an adequate alternative to allow ORC to spend its private funds to express its view about family planning options, including abortion, without interfering with the State's right to express a view in favor of adoption as a preferable family planning choice.  ORC is not compelled to adopt the State's message or give up its right to express views in favor of abortion as a reasonable family planning method, and the State is not limiting ORC's right to express a particular viewpoint or regulating ORC's speech activities carried out with

20

its private funds.  Thus,  § 1104.6 does not constitute viewpoint discrimination in violation of the First Amendment.

C.

ORC's final argument is that § 1104.6 violates the Equal Protection Clause of the Fourteenth Amendment because it treats similarly situated non-profit organizations differently based solely on the viewpoints about family planning options for which the organizations advocate.  Both parties agree that the First Amendment and Equal Protection issues are intertwined, and the equal protection analysis will track the parties' arguments based on the First Amendment.   As a separate argument, ORC asserts that, under a "traditional" equal protection analysis, the Court must apply strict scrutiny to the challenged classification because the classification involves ORC's fundamental right to free speech.  Defendant responds that § 1104.6 is subject to rational basis review under the Equal Protection Clause, and should be upheld as a legitimate exercise of the State's power to favor adoption over abortion in the expenditure of state funds.

The Equal Protection Clause of the Fourteenth Amendment states that "[n]o State . . . shall deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1. "The Clause 'creates no substantive rights.  Instead, it embodies a general rule that States must treat like cases alike but treat unlike cases accordingly.'" Teigen v. Renfrow, 511 F.3d 1072, 1083 (10th Cir. 2007) (quoting Vacco v. Quill, 521 U.S. 793, 799 (1997)).   When a First Amendment and equal protection claim are intertwined, the First Amendment provides the proper framework for review of both claims. See Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 228 n.3 (1987); Police Dep't of City of Chicago v. Mosley, 408 U.S. 92, 94 (1972); McGuire v. Reilly, 260 F.3d 36, 49 (1st Cir. 2001).  The Court has already considered plaintiff's claims under

21

the First Amendment and determined that § 1104.6 does not deprive plaintiff of its right to provide abortion-related services with its private funds, because the statute can be interpreted to provide an adequate alternative to protect ORC's speech rights.  To the extent that plaintiff's First Amendment and equal protection arguments overlap, the Court has fully addressed plaintiff's First Amendment claims.

However, plaintiff also asks the Court to apply a "traditional" equal protection analysis and review ORC's equal protection claim applying a strict scrutiny standard of review. Dkt. # 153, at 18.  In most cases, unless a statute "'jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic,' it will be 'presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.'" Coalition for Equal Rights, Inc. v. Ritter, 517 F.3d 1195 (10th Cir. 2008).  Plaintiff argues that § 1104.6 is subject to strict scrutiny review because it burdens ORC's fundamental right to free speech.  However, the Court has determined that plaintiff's First Amendment rights have not been violated, and the rational basis standard of review applies.  KT & G Corp, 535 F.3d at 1137 (concluding that rational basis standard applies if a court has rejected the plaintiff's argument that its rights under the First Amendment have been violated by a state statute).  A statute will be struck down under rational basis review only if it is not rationally related to a legitimate state interest. The American Civil Liberties Union of New Mexico v. Santillanes, 546 F.3d 1313, 1319 (10th Cir. 2008); Price-Cornelison v. Brooks, 524 F.3d 1103, 1109 (10th Cir. 2008).  Under rational basis review, "when legislative judgment is called into question on equal protection grounds and the issue is debatable, the decision of the legislature must be upheld if 'any state of facts either known or which could reasonably be assumed affords support for it.'" Powers v. Harris, 379 F.3d 1208, 1216-

17 (10th Cir. 2004) (quoting <u>United States v. Carolene Prods. Co.</u>, 304 U.S. 144, 154 (1938)).  The

party attacking the "rationality of the legislative classification [has] the burden 'to negative every

conceivable basis which might support it.'" <u>Schutz v. Thorne</u>, 415 F.3d 1128, 1136 (10th Cir. 2005)

(quoting FCC  v. Beach Communications, 508 U.S. 307, 315 (1993)).

Plaintiff assumes that strict scrutiny applies and does not offer any argument as to application

of the rational basis standard to § 1104.6.  The Court has reviewed the statute and finds that the

statute is rationally related to a legitimate state interest.  Defendant is correct that the State may

express a position in favor of family planning methods other than abortion, and the "Legislature

could have rationally decided that the stated purpose of § 1104.6 to 'provide services to the

community that include counseling and meeting the physical needs of pregnant women who are

committed to placing their children for adoption' might be fostered by the classification scheme of

the statute."  Dkt. # 156, at 7.  On rational basis review, the burden is on the party attacking the

statute to show that there is no rational relationship between the statute and a legitimate state

interest.  Contrary to ORC's position, the State has not banned all privately funded abortion

activities by enacting § 1104.6.  Dkt. # 157, at 8-9.  The State has limited access to certain funding

for adoption-related activities but, as the Court has already determined, the statute provides a

sufficient alternative for ORC to apply for funding and maintain its abortion-related activities

through a structurally separate affiliate.  Thus, § 1104.6 is rationally related to the state's legitimate

interest in promoting adoption instead of abortion, and ORC has not carried its burden to show that

§ 1104.6 is unconstitutional under the Equal Protection Clause.

**IV.**

The Court has determined that § 1104.6 does not violate ORC's rights under the First Amendment or the Equal Protection Clause of the Fourteenth Amendment, and plaintiff's motion for summary judgment should be denied.  The parties agree that there are no genuine issues of material fact.  However, defendant has not moved for summary judgment and LCvR 7.2(e) expressly forbids a party from including a cross-motion for summary judgment in a response to a motion for summary judgment.   The parties are directed to submit a status report informing the Court if any issues remain for adjudication or, in the alternative, the parties may submit a proposed judgment agreed as to form if the parties believe this Opinion and Order has resolved all remaining issues.

**IT IS THEREFORE ORDERED** that Plaintiff ORC's Motion for Summary Judgment and Brief in Support (Dkt. # 153) is **denied**.

**IT IS FURTHER ORDERED** that the parties shall submit a joint status report advising the Court  if any issues remain for adjudication, or submit a proposed judgment agreed as to form, no later than **August 14, 2009**.

**DATED** this 31st day of July, 2009.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

24